# Cordova Coal Co. v. Long.

### Bill in Equity to enforce Vendor's Lien on Land.

1. *Change of corporate name; privity of contract.*—Complainant having contracted in writing to sell and convey a large body of lands to a private corporation, and afterwards, at its instance, organized another corporation, of which, with nominal exceptions, he was the only stockholder, making his subscription of stock payable by a conveyance of said lands; and the two corporations being then consolidated by agreement, on terms which corresponded with his original contract, he conveyed the lands to the consolidated company; *held*, that the complainant's contractual relations with the corporation were not affected by the change of name, and that he was entitled, as against the consolidated company, to all the rights and remedies he had against the company with which he first contracted.

2. *Vendor's lien; payment in bonds, or chattels.*—On a sale of lands to a corporation, part of the purchase-money being payable in its

[Cordova Coal Co. v. Long.]

bonds, a vendor's lien is presumptively retained, and may be enforced to the extent of the cash value of the bonds, on failure to deliver them as stipulated.

3. *Performance within reasonable time; demand.*—When no time is specified for the performance of an act, the law requires that it shall be performed within a reasonable time; and when it may be made within a reasonable time, as to which the parties may differ, a prior demand is a pre-requisite of suit.

4. *Stipulation for payment "in bonds of company."*—Under a contract for the sale and conveyance of a tract of land to a corporation, the purchase-money payable partly in cash, partly in stock, "and $58,000 in the bonds of the company," there is no implied stipulation that preferred bonds shall be delivered, nor that the corporation will not issue bonds to a larger amount, within the powers granted by its charter, although the market value of the bonds may be thereby depreciated.

APPEAL from the Chancery Court of Walker.

Heard before the Hon. THOMAS COBBS.

The material facts of this case, as shown by the bill and exhibits, are these. (1.) On the 5th February, 1888, by written contract between Benjamin M. Long and the New Orleans & Alabama Coal & Mining Company, a corporation organized under the general statutes, Long agreed to sell and convey to said corporation 12,000 acres of land in Walker county, in consideration of which, as recited, the company "shall pay and deliver to said Long $50,000 in cash, $70,000 in bonds of the company, and $120,000 in stock of the company;" and the contract contained a further stipulation in these words: "It is distinctly understood and agreed, that no payment of any money, or delivery of any stock or bonds, shall be due to, or demanded by said Long, until the lands are examined and accepted by the company, and the titles to the same are examined and approved by its authorized attorney." (2.) On the 24th July, 1888, the terms of this contract were modified, by reducing the number of acres of land to 10,800; the new contract, as reduced to writing, and signed by both parties, reciting "that this agreement modifies the agreement previously entered into, by reducing the acreage from 12,000 to 10,800 acres, but the terms of payment [are] to be in the same proportion as provided in said agreement February 5th, above referred to." (3.) On the 19th September, 1888, the Cordova Coal Company was organized under the general statutes, said B. M. Long subscribing for all the stock, except one hundred shares taken by his son, and ten shares taken by one Simonds, attorney of said N. O. & Ala. Coal and Mining Company, and making his subscription payable by a conveyance of 10,800 acres of land in the county. The bill alleged that this was done at the instance of the said N. O. & Ala. Coal and Mining Company, for the purpose of effecting a con-

solidation of the two corporations; and that nothing was ever paid by young Long or Simonds on the stock subscribed by them respectively. (4.) On the 21st September, 1888, the two corporations were consolidated under the name of the Cordova Coal Company. The articles of consolidation were signed by Long, as president of his corporation, and by John T. Hardie as president of the N. O. & Ala. company, and after reciting the resolutions of the stockholders authorizing the consolidation, stated the following as the terms of the consolidation: (1.) "That the name and charter of the consolidated corporation shall be the same as the name and charter of the Cordova Coal Company. (2.) That the capital stock of the consolidated company shall be $500,000, divided into five thousand shares of $100 each. That the Cordova Coal Company shall receive 1,080 shares thereof, and the New Orleans & Ala. Coal & Mining Company shall receive 2,600 shares. That the Cordova Coal Company shall receive $50,000 in cash, and $58,000 in the bonds of the company." (5.) On the 26th September, 1888, Long and his wife executed a deed with covenants of warranty, conveying to said consolidated corporation 10,800 acres of land in the county, particularly described, the consideration recited being $10,000 in hand paid, and $300,000 of the capital stock of said corporation; but the bill alleged that the consideration was as recited in the modified contract above set out, and that $50,000 was paid in cash.

The bill was filed, on what day the record does not show, by Long against said consolidated company, and sought to enforce a vendor's lien on the land for $58,000, as the money value of the bonds; alleging that the bonds of the corporation had never been delivered to him, and that the corporation was about to issue bonds to the amount of $250,000, out of which the $58,000 due to him were to be delivered, thereby depreciating their value to at least 85 cents on the dollar; and he prayed an injunction against this issue of bonds. The defendant demurred to the bill, on the following (with other) grounds: (1.) "There is no privity between the plaintiff and this defendant." (2.) "The bill fails to show a breach of the contract to deliver the amount of bonds claimed, or that any demand has ever been made on defendant for said bonds." (3.) "The bill is repugnant and inconsistent, in that it alleges the debt due to the complainant is the delivery of specific articles, to-wit, bonds of the defendant, and prays for a foreclosure for a certain amount of money." (4.) "The bill shows that plaintiff agreed to take the bonds of the company, and thereby waived his vendor's lien." The chancellor overruled the demurrers, and his decree is here assigned as error.

[Cordova Coal Co. v. Long.]

SEMPLE & LITTLE, for appellant.—(1.) There is no privity of contract between the parties to this suit. Plaintiff contracted to sell his lands to the N. O. & Ala. company, but afterwards organized another corporation, making his subscription payable by a conveyance of the same lands; and on a consolidation of the two corporations, conveyed the lands to the consolidated company. This was clearly a novation, and destroys the original contract. (2.) The bill shows a claim for the delivery of bonds, and seeks to enforce a lien for a certain amount of money.—*Little v. Snedecor*, 52 Ala. 167. (3.) The vendor's lien was waived by the agreement to take the bonds of the company.—*Walker v. Struve*, 70 Ala. 167; *Foster v. Trustees*, 3 Ala. 302; *Stringfellow v. Ivie*, 73 Ala. 215; *Tedder v. Steele*, 70 Ala. 347; *Jackson v. Stanley*, 87 Ala. 270; *Beecher v. Patton*, 62 Ala. 579; *Williams v. McCarty*, 74 Ala. 295; *Sims v. Williams*, 22 Ala 512; *Harvey v. Kelly*, 41 Miss. 490; *Patterson v. Edwards*, 29 Miss. 67; *Plowman v. Riddle*, 14 Ala. 169; 4 Wait's A. & D. 322. (4.) No demand of the bonds is averred, nor any excuse given for the failure to make demand. (5) The writings show the contract between the parties, and they call only for " bonds of the company." No particular kind of bonds is specified, and parol evidence could not be received to change the contract; and yet plaintiff seeks to prevent the issue of bonds, out of which he may be paid, because they are not such bonds as he expected to receive.

HEWITT, WALKER & PORTER, and SMITH & LOWE, *contra.* (1.) The complainant's right to maintain this suit is clear. When two or more mining companies consolidate under the statute, the original companies cease to exist for any purpose, while the new company is vested with all their rights, and assumes all their liabilities. Even pending suits are required to be further prosecuted by and against the new company, but liens on property remain binding.—Mor. Corp., § 954; *Railroad Co. v. Maine*, 96 U. S. 509; *Railroad Co. v. Georgia*, 98 U. S. 359; *Railroad Co. v. Maryland*, 10 How. 393; *Shields v. Ohio*, 95 U. S. 319; *Railroad Co. v. Hunt*, 20 Ind. 457; 114 U. S. 587. (2.) A vendor's lien attached, on non-delivery of the bonds.—*Smith v. Vaughan*, 78 Ala. 201. (3.) No demand was necessary before the institution of the suit. The bonds were to be delivered presently, or at least within a reasonable time, which had elapsed before the bill was filed.—*Neal v. Clay*, 48 Ala. 252; *Russell v. McCormack*, 45 Ala. 391; 5 Amer. & Eng. Encyc. Law, 527, 528a. (4.) If a demand was ever necessary, the facts stated in the bill show that it would have been unavailing, as the company was

preparing to issue bonds which were violative of the terms of the contract between the parties.

McCLELLAN, J.—We do not doubt that B. M. Long, appellee here, and complainant below, has all the rights against the consolidated Cordova Coal Company, with respect to the lands in controversy, that he originally could have asserted against the New Orleans & Alabama Coal & Mining Company. The first Cordova Coal Company appears to have been organized by Long at the instance of the New Orleans company, entirely for the purposes of consolidation between the two under the name of the newly organized company, and with a view to the acquisition of its larger powers. In substance, the transaction, so far as Long's contractual relations were concerned, amounted to a change of the name of the corporation to which he had undertaken to convey the lands; and there is, we do not question, such privity between him and the consolidated corporation as entitles him to all the rights and remedies he had against the New Orleans company in the premises.

Under the contract of sale, as modified, the Cordova Coal Company, in consideration of the conveyance to it by Long of certain lands, containing 10,800 acres, was to " pay and deliver to him $50,000 in cash $108,000 in the stock of the company, and $58,000 in the bonds of the company." The money was paid before the consolidation, and the stock was delivered after that time; but the bonds contracted for had not been delivered when the bill was filed. It is now sought to have declared and enforced a vendor's lien on the land for $58,000 in money, on the theory, that the bonds were not delivered when they should have been under the contract; that the value of such bonds as were in contemplation of the parties was $58,000, and that the failure to deliver them as contracted invests the complainant with a right to claim their value in money as a part of the purchase price of the land, and enforce the claim as a vendor's lein.

The doctrine generally prevailing outside of Alabama, it may be admitted, is, that when land is conveyed in consideration of the transfer and delivery to the vendor of chattels, *choses* in action, and the like, no lien exists in favor of the vendor to enforce such delivery, or coerce the payment of a money equivalent, the claim in such cases being considered unliquidated and uncertain.—2 Jones on Liens, § 1071. But the contrary view is taken in this State, and has prevailed too long and been too uniformly adhered to to be now disturbed, even if it be unsound in principle, of which we are by no means con-

[Cordova Coal Co. v. Long.]

vinced. The rule here is, that when the consideration is the delivery of chattels, which are capable of reduction to a money value, a lien exists for the collection of such value, upon a failure to deliver them in accordance with the terms of the contract.—*Neal v. Clay*, 48 Ala. 252; *Smith v. Vaughan*, 78 Ala. 201.

The undertaking to deliver bonds of the company, in the case at bar, is within the principle of these cases. As we construe the contract, it involves no promise to pay $58,000 in money, to be secured by the delivery of the bonds; nor to pay so much money, with a stipulation that it may be discharged by a delivery of the bonds of the company, as in *Plowman v. Riddle*, 14 Ala. 169, where the sum agreed on was payable in leather. But here, the primary, and indeed only undertaking, with respect to this part of the consideration, was to deliver bonds of an incorporation, of the face value of $58,000; not. in payment of any sum of money ageed to be paid, for there was no such agreement, nor to secure any such payment of money, but in direct consideration of the conveyance. And within the rule stated, the bonds are chattels, *choses* in action, capable of reduction to a money value; and under that rule, the *prima facie* presumption is, that a lien was retained on the land to enforce the payment of that money value, upon a failure to deliver these chattels, according to the terms of the contract.

The question of chief importance in this case is, whether there has been such a failure on the part of the corporation to deliver the stipulated bonds as entitles the complainant to proceed against the land for their value; and this involves the further inquiries, (1) when were the bonds to be delivered, and (2) what character of bonds was to be delivered. It is very clear, we think, that immedate delivery was not contemplated, and could not in the nature of things have been effected. The original contract for the conveyance of the lands was entered into on February 5th, or 6th, 1888. Its concluding stipulation is in the following language: "It is distinctly understood and agreed, that no payment of any money, or delivery of any stock or bonds, shall be due to, or demanded by said Long, until the lands are examined and accepted by the company, and the titles to the same are examined and approved by its authorized attorney." This contract was modified on July 24th, 1888, but expressly only to the extent of reducing the acreage to be conveyed from 12,000 to 10,800 acres, with a corresponding reduction in the price. The whole theory of complainant's case must find support in, and is, in fact, expressly made to depend upon, this contract as thus modified,

being the only subsisting agreement between him and the consolidated Cordova Coal Company. In it, and in it alone, are found the stipulations under which the lands were to be, and were on September 26th, and October 17th, 1888, subsequent to the consolidation of the two original companies, conveyed to the new Cordova Coal Company. The stipulation we have quoted must, therefore, be still a part of the contract between the parties; and under it there could be no breach of its terms, as to delivery of the bonds, until after the lands had been examined and accepted, and the title to the same examined and approved by the company's attorney. There is no averment in the bill that this has ever been done.

But, aside from this, it is alleged, that the $50,000 in cash was paid before the consolidation of the two original companies. This fact can not be of moment in determining that the lands had been examined, &c.; for *non constat*, but that the condition precedent to any payment or delivery was to this extent waived by the purchaser. But it is of importance as showing that it was not the intention of the parties, or within their contemplation, that the stock and bonds should be delivered presently, or contemporaneously with the payment of the money; for, to the contrary, the agreement of consolidation, made subsequent to the payment of the $50,000 in money, provides for the delivery thereafter of the stock and bonds. Moreover, neither the stock nor the bonds could be delivered for some time after the consolidation of September 21st, 1888. Time was necessary to prepare and issue and deliver the former; and with respect to the latter, their issuance, their denominations, the rate of interest they were to bear, the amount to be issued, &c., had to be considered, determined upon, and authorized by the corporation, and a mortgage or deed of trust to secure their payment had to be prepared and executed, before there could be any delivery to the complainant. All these considerations exclude the idea that they were to be presently delivered, and lead to and enforce the conclusion, that, at most, a delivery within a reasonable time would satisfy and fill the terms of the contract. Parties may in good faith differ as to what is a reasonable time within which an act is to be done. The party upon whom it rests to perform the act, may be ready and willing to do so, and only delay performance because he believes he has further time. It is, perhaps, on these considerations that the law requires in such a case a demand for performance before the party undertaking to act can be put in default with respect to the act to be done. While suit itself is a legal, and the only necessary demand ordinarily, under a contract payable in money, the contrary doctrine, that

demand must precede any suit in the premises, applies to all contracts for delivery within a reasonable time of goods and chattels, corporeal and incorporeal— *Wyatt v. Bailey*, 1 Morr. (Iowa), 396; *Bradley v. Farrington*, 4 Ark. 532; *Martin v. Chaurin*, 7 Mo. 277; *State v. Mooney*, 65 Mo. 494; *Widner v. Walsh*, 3 Colo. 548; *Frazer v. McCord*, 1 Ind. 224.

There is no averment in the present bill of a demand for the delivery of "$58,000 in the bonds of the company," but the necessity for such a demand is sought to be obviated by averments which are intended to show that it would not have been complied with. These averments are, that the Cordova Coal Company had authorized, and was about to issue $250,000 in the bonds of the company, out of which its purpose was to deliver bonds to the amount of $58,000 to the complainant, in discharge of its contract; that "it was not contemplated when he [the complainant] entered into said contract for the sale of his lands, that the said company should issue bonds to a greater extent than sufficient to pay orator the purchase-money [*i. e.*, deliver to him $58,000 in bonds] for said lands;" and that the issuance of bonds to the extent of $250,000, instead of $58,000, would have the effect of depreciating the bonds delivered to complainant, from par to eighty-five cents on the dollar.

We will concede, for the argument, that if the company had resolved not to deliver, and did not intend to deliver, bonds of the character called for by the contract, a demand for them would have been unavailing, and the complainant was under no necessity to make it. The question then recurs: Do these averments show that state of facts? Do the allegations of the bill, taken in connection with the contracts exhibited thereto, show that the corporation had resolved not to deliver bonds of the kind called for by the agreement? It sufficiently appears from the bill, that the company would have delivered bonds to the amount required, out of an issue of a larger amount than was necessary to that end. The real inquiry then is, Would such delivery have been a compliance with the contract? It is very clear, that this question must be determined by the writings, uncontrolled by what may have been the "contemplation" even of both parties thereto, much less by the alleged fact, for so the bill must be construed, that complainant did not contemplate the issuance of more than $58,000 of the company's bonds. This "contemplation," at most, imports expectation, or belief, not binding stipulation; and to hold that the corporation had bound itself not to issue more than $58,000 of its bonds, because the complainant, or even its own officers and the complainant, had *expected* that

35

it would not do so, would be an anomaly to which we are unable to subscribe. Equally untenable is the position, advanced by the bill, that for the corporation to exceed complainant's expectations in this regard, would be a fraud on him. Not only so, but even had there been a parol contemporaneous agreement to this effect, instead of a mere expectation of the parties, or one of them, we can not see how any efficacy could be accorded to it, to change the terms of the writings. We, therefore, proceed to determine whether the issuance of $250,000 of bonds, and a delivery of $58,000 in bonds out of that issue, would be a compliance with the contract of the parties, as it is written.

Everywhere in these writings, and in the averments of the bill, the bonds which were to be delivered are described simply as "bonds of the company." Everywhere, the undertaking is to deliver to the complainant "$58,000 in the bonds of the company." They are nowhere described beyond this. These terms have a well defined signification, when used with reference to incorporated companies. They imply a series of obligations to pay money at some distant date, with interest payable at short intervals, secured by a mortgage or deed of trust on the corporate property, passed from hand to hand by delivery, issued for the purpose of paying—not securing—indebtedness, or to raise a working capital, and are usually purchased as an investment. It was confessedly this kind of bond which the Cordova Coal Company bound itself to deliver to Long. Its charter authorized it to issue $500,000 of these bonds. It is to be assumed that this power is a valuable and necessary one to corporations of this character, and one not to be taken as surrendered, in whole, or in any material part, except upon satisfactory proof of an intention to surrender it, and a binding contract to that end. It is fair to assume, also, that the property of this corporation was worth the amount of its capital stock, or, at least, the amount of that stock which had been subscribed for and issued, since our laws forbid the issuance of stock which is not fully paid; and this record discloses that it had issued stock aggregating $368,000. Is it at all reasonable to suppose that the corporation would bind itself to limit its issue of bonds, secured by property of this value, to $58,000, or that Long could with any plausibility insist upon or even expect such a limitation? Such result must find support in the terms of the paper, before it can be adopted. The writings indicate no such limitation. On the contrary, the terms used, "$58,000 in bonds of the company," rather imply than otherwise, that this lot of bonds is to be a part of a larger issue. These terms are referable to the corporate power to issue

[Cordova Coal Co. v. Long.[

$500,000 of such bonds. They are used in recognition of that power, and import very clearly to our minds, that Long shall receive $58,000 *of* the bonds which the company may in its discretion issue under that power, whether $250,000 or $500,000, or any other amount the stockholders might deem expedient. There is no hint of bargaining away this valuable and important power in the papers, or of limiting corporate discretion in the exercise of it. It is not said even that Long shall have a first mortgage, or prior lien to secure his bonds. Nor is it stipulated when the bonds shall mature, what rate of interest they shall bear, where they shall be payable, in what denominations they shall be issued, nor whether they shall be secured by a mortgage or a deed of trust. All these matters are left in the discretion of the company. Yet, Long, for aught that appears in the contract, might as well have filed this bill because the bonds authorized were to mature in ten years, or were to bear six per cent. interest, or were to be payable in Birmingham, etc., when he had contemplated their maturity at twenty years, or that they were to bear eight per cent. interest, or were to be payable in New York, etc., as to now insist that he is under no obligation to take bonds which are a part of a larger issue, which it was clearly within the competency and discretion of the company to authorize, issue, and put on the market.

We feel no hesitancy in holding this contract to mean, that the corporation would deliver to Long $58,000 in its bonds, out of, and constituting a part of, any isssue of bonds it might authorize within the limitations of its charter. The issue of $250,000 was within its charter powers; and a delivery of bonds to the face value of $58,000, out of that issue, would have been a full compliance with the contract. The facts alleged as an excuse for pretermitting a demand for the bonds before filing this bill, are wholly inadequate to that end. No default on the part of the company is shown; but, on the contrary, the complainant presents the anomalous attitude of praying an injunction to prevent it from complying with the contract which he affirms they are violating.

The 2d, 3d and 4th grounds of demurrer, under the view we have taken of this case, should have been sustained. For error committed in overruling them, the decree of the Chancellor is reversed, and the cause remanded.

Reversed and remanded.