(79 South. 615)

DIXIE INDUSTRIAL CO. et al. v. BENSON et al. (3 Div. 354.)

(Supreme Court of Alabama. June 6, 1918. Rehearing Denied June 29, 1918.)

1. VENDOR AND PURCHASER ⬦⇒254(4)—VENDOR'S LIEN—CONSIDERATION—DELIVERY OF CHATTELS.

When consideration for sale of land is delivery of chattels and choses in action, being reducible to money value, vendor's lien exists for collection of such value, upon failure to deliver according to terms of contract.

2. VENDOR AND PURCHASER ⬦⇒254(1)—VENDOR'S LIEN—FAILURE OF PAYMENT—PRESUMPTIONS.

In every sale of lands, when the purchase money is not paid, the law presumes reservation of a vendor's lien, unless the terms of the contract of sale, or attendant circumstances, satisfactorily show that it was purposely excluded.

3. VENDOR AND PURCHASER ⬦⇒254(4)—VENDOR'S LIEN—AGREEMENT TO PAY EXCESS VALUE.

Where "personal" and other lands were sold to corporation at $4.25 an acre, on consideration of $7,500 in stock, and assumption of vendor's indebtedness, company's agreement, if "personal" lands exceeded $5 per acre in value, to pay excess in stock, cash, or other proceeds, was consideration for contract, and secured by vendor's lien, if land was more valuable.

4. VENDOR AND PURCHASER ⬦⇒22—CERTAINTY OF DESCRIPTION.

Where certain "personal" lands of plaintiff, belonging to him individually, were conveyed with others to defendant company, the description of the "personal" lands by government numbers was sufficiently certain.

5. EQUITY ⬦⇒149 — PLEADING — MISJOINDER OF PARTIES.

A bill to enforce vendor's lien, wherein the original vendor, as asserting equitable right to an additional sum due, was joined as party complainant with the administrator of the estate of his son, deceased, who, on face of the contract, on account of mistake, as it was alleged, appeared to have the legal right to the sum, did not present a misjoinder of parties complainant.

6. EQUITY ⬦⇒148(3) — PLEADING — MULTIFARIOUSNESS.

Bill to enforce a vendor's lien, charging subsequent purchasers from the vendee with notice, and praying, if the court should hold the lands themselves should not be charged for the debt, that unpaid purchase money due the original vendee be condemned and applied to the debt, was not multifarious.

7. GAMING ⬦⇒11—SPECULATIVE VENTURE—SALE OF LAND.

A vendor of lands, because the contract provided that, if certain "personal" lands conveyed by him were worth more than $5 an acre, the vendee should pay the excess value, was not prevented from enforcing his vendor's lien; contract not being a speculative venture.

8. CONTRACTS ⬦⇒311 — DEATH OF PARTY — ELECTION—PERSONAL CHARACTER.

Election, to be made by son of vendor of lands, as to whether amount found to be due as price should be paid in money, stock of vendee corporation, or other proceeds, was not of such personal character as to destroy any rights thereunder, because of son's death without having elected.

Appeal from Circuit Court, Montgomery County; Leon McCord, Judge.

Suit by John J. Benson, individually and as administrator, against the Dixie Industrial Company and others. From a decree overruling demurrers, respondents appeal. Affirmed.

This bill was filed by John J. Benson, individually and as administrator of the estate of William E. Benson, deceased, against the Dixie Industrial Company, a corporation, the Kowaliga Academic and Industrial School, a corporation, Alabama Interstate Power Company, a corporation, and one Benjamin Russell. The bill sought the enforcement of a vendor's lien upon a certain 540 acres of land therein specifically described, and alleges in substance as follows:

John J. Benson in 1900 was the owner of 540 acres of land in Elmore county, Ala., and, having contracted for the purchase of 4,568

acres of land in the same or an adjoining county, on which he owed a large sum of money, entered into a contract with the Dixie Industrial Company to sell to said company both of said tracts of land, amounting to 5,108 acres, at the price of $4.25 per acre. The terms and conditions of the purchase, appearing in a copy of the contract entered upon the minutes of said corporation on November 1, 1900, are as follows:

"The said Benson agrees to sell and said company agrees to buy five thousand one hundred and eight (5,108) acres of land described in conveyance of even date at four dollars and twenty-five cents ($4.25) per acre on the following terms and conditions, viz.: The said J. J. Benson is to receive in part payment seven hundred and fifty (750) shares of paid-up capital stock in said company at par value of ten dollars ($10.-00) per share, to be issued as directed by him, and said company is to take up the balance of unpaid notes of J. J. Benson still due the loan company et al. on his contract for the purchase of four thousand six hundred and eight (4,608) acres of land. It is agreed that, should there be any difference between the price of the lands bought from J. J. Benson and the value of the stock and other obligations assumed by the Dixie Industrial Company, such differences will be covered by note, which will be held by the company in suspense pending final adjustment. Said J. J. Benson guarantees the valuation of said lands to reach at least $5.00 per acre, in which event said note is not to be paid, but to be canceled and surrendered by the company. In the event the value of said lands exceed five dollars per acre, it is agreed that any excess with respect to the five hundred and forty acres of personal lands included in this sale, which it is understood that said J. J. Benson is putting in to pay for stock on his own and on behalf of his son, Wm. E. Benson, shall be paid in additional stock of the company or in cash, or in such other proceeds as said Wm. E. Benson may elect to accept at the time of adjustment, to be made within the expiration of twenty years from date.

"It is expressly understood that the said J. J. Benson, in contracting for the purchase of bulk of said lands from the loan company et al. prior to the organization of said Dixie Industrial Company, have turned them over to the company without desire of making any substantial profits therefrom or expectation of participating in any subsequent enhancement of property values, except only as to his personal lands amounting to five hundred and forty (540) acres above mentioned, which said lands are spendidly improved and under such state of cultivation as to make them now worth more than five dollars ($5.00) per acre, but said J. J. Benson, desiring to aid in the formation and the organization of said company, which could not be completed without such aid, is induced to put in said lands by Wm. E. Benson, on the conditions herein named and agreed to."

It is then averred that the original contract signed between John J. Benson, individually, and the Dixie Industrial Company, is dated the 1st day of November, 1900, and is identical with the copy above set out, with the exception that the next to the last clause, commencing with the words "In the event the valuation of said lands," and ending with the words "within the expiration of twenty years from date," is, in the original, in the following form:

"In the event the valuation of said lands should exceed five dollars ($5.00) per acre, it is agreed that any excess with respect to the five hundred and forty (540) acres of the personal lands included in this sale, which it is understood that said J. J. Benson is putting in to pay for stock on behalf of his son Wm. E. Benson, shall be paid to said son in additional stock of the company, or in cash, or in such other proceeds as said Wm. E. Benson may elect to accept at the time of adjustment within the expiration of twenty years from date."

It is averred that it was the intention of John J. Benson to sign the original contract as appeared in the copy above set out and entered upon the minutes of the Dixie Industrial Company of November 1, 1900, but by mistake or inadvertence, and without his actual knowledge, the above clause, showing a variation between the copy on the minutes and the original as above referred to, was changed so as to be in the terms of the original; and therefore it might appear there was some conflict between William E. Benson and John J. Benson as to the several rights and interests of these parties in result of a settlement as to the 540 acres of land mentioned in the contract, and here sought to be adjusted. But this difference or conflict, if it exists, does not concern the defendants in this suit, but only John J. Benson individually and the estate of William E. Benson, represented by him as administrator. Both of said parties join in this suit as complainants, so that there may be no difficulty as to the defendants making an adjustment of the rights of all parties in reference to the said 540 acres of land. The said John J. Benson, individually and as administrator of the estate of William E. Benson, deceased, will adjust their differences, if any, between themselves by separate proceedings hereafter to be instituted, and here join in any and all acquittances which may be necessary to finally adjust the said matter in dispute in this case between the said Dixie Industrial Company and the complainants.

The third paragraph avers there has never been any adjustment as provided for in said contract between the complainants, or either of them, and the Dixie Industrial Company, and this bill is filed for the purpose of having said adjustment made. By the fourth paragraph it is averred that the lands contracted to be sold to the Dixie Industrial Company were conveyed to it by two deeds, one for 3,328 acres of land, and the other—by subsequent deed in 1904—for 1,780 acres, and that said company went into possession of the land so conveyed, and it or its vendees have so remained since; that the value of the said land is and was more than $5 per acre, and the 540 acres of "personal lands," mentioned in said contract as belonging to said J. J. Benson, individually, were conveyed in said deed of 1,780 acres as of February 12, 1904. Then follows a description of said 540 acres by government numbers. It is then averred that the Dixie Industrial Company conveyed said lands in

1912 to the respondent Kowaliga Academic and Industrial School, and on the same day a deed was executed to said respondent to the other property referred to in the first deed above mentioned; the consideration for the first deed herein mentioned being $5,000 and 20 notes, and the consideration of the second deed being $2,000, constituting one promissory note.

Paragraph 5 of the bill avers that in March, 1913, respondent Kowaliga Academic and Industrial School entered into a contract with the respondent Alabama Interstate Power Company to sell certain lands acquired (as above stated) from the Dixie Industrial Company, including the 540 acres of individual lands of John J. Benson, at the price of $25 per acre, and in June, 1913, entered into another and more formal agreement with the said Dixie Industrial Company and Kowaliga Academic and Industrial School for the sale of the same lands, but no deed has passed for said lands so far as complainants know to date. Upon information it is averred that $10 per acre has been paid as a cash payment upon said purchase, and $15 per acre is still unpaid, payable as described in the last-mentioned contract. In said contract of the Alabama Interstate Power Company the timber and other rights were reserved.

In the sixth paragraph it is alleged that the 540 acres of land, referred to as the individual lands of John J. Benson, are worth $35 per acre, and were worth that amount at the time of the contract of sale to the Alabama Interstate Power Company, including the reservations. In paragraph 7, it is alleged that under the terms of the contract of sale to the Dixie Industrial Company there was due on the said 540 acres of land the difference between $5 per acre and the value of the said lands at the date of the filing of this bill and at the date of said contract of sale to the said Alabama Interstate Power Company. Complainants now elect to adjust said values as provided by said contract, and elect to take the difference due them, or either of them, in cash, instead of in stock of said Dixie Industrial Company, or in other proceeds.

The bill further avers that the Kowaliga Academic and Industrial School has never paid the agreed consideration, and that there is still due on the purchase money agreed to be paid to the Dixie Industrial Company the sum of $20,000, which is a lien upon said lands agreed to be sold to the Alabama Interstate Power Company, and of which lien the said Alabama Interstate Power Company had notice at the time of its purchase. It is further averred that there is due and unpaid the sum of $8,100 by the said Alabama Interstate Power Company for the 540 acres of land, which is a lien upon said land. Defendants to this bill each had notice of complainants' rights and liens at the time of their several purchases. Respondent Russell is alleged to have purchased the timber upon said 540 acres, reserved in the above sales, which is in part or in whole still uncut, and there is due by the said Russell, or will be due upon his contract of purchase, the sum of $5,000.

The bill prays for an adjustment of the amount due the complainants under the terms of the contract on and for the said 540 acres of land described as being the individual lands of said John J. Benson, for the purpose of ascertaining the amount of such liability to the complainants. It is further prayed that a decree be rendered subjecting to the payment of such debt the said 540 acres of land, so far as it may be equitable and just to charge the same for said debt in justice to the purchasers of said lands from the Dixie Industrial Company, and, in the event said lands may not be charged in equity for said debt, that the lien of the Dixie Industrial Company upon said lands against the Kowaliga Academic and Industrial School on the sale of said lands to it, so far as unpaid, may be enforced for complainants' benefit for the payment of this debt; that the purchase money still due and unpaid from the Alabama Interstate Power Company to the Dixie Industrial Company and the said Kowaliga Academic and Industrial School, to the extent the same may be still unpaid, if necessary, may be condemned and applied to the payment of complainants' debt. Like relief is prayed as to any unpaid balance as to respondent Russell for the purchase price of said timber. There is also general prayer for relief.

Respondents filed separate and several demurrers, attacking the bill for misjoinder of parties respondent, for multifariousness, and upon the further grounds that the vendor's lien cannot be enforced for an uncertain, contingent, or indefinite demand, cannot be enforced where the description of the land is indefinite and uncertain, cannot be enforced where it appears from the whole transaction that the vendor of the lands trusts to the personal responsibility of the vendee, and does not look to the land as security; that the lien cannot be enforced by the transferee, who acquires the debt from the vendor, under such circumstances as to relieve the vendor of all liability therefor; that, in order for equity to relieve against the consequence of a mistake, the mistake must be mutual, or must have been induced by the misconduct of the other party; upon the further ground that courts will never give a contract such a construction as will convert it into a mere speculative contract, and where a personal privilege is reserved to a party to a contract, and such party dies without having asserted his right under the contract, the privilege and right expire. There was a decree overruling these demur-

rers, and from this decree this appeal is prosecuted.

Rushton, Williams & Crenshaw, of Montgomery, and Thos. W. Martin, of Birmingham, for appellants. W. A. Gunter, of Montgomery, for appellees.

GARDNER, J. It is strenuously insisted upon this appeal that no relief can be had by way of enforcement of the vendor's lien under such a contract, as set out in the foregoing statement of the case, on account of the uncertainty and indefiniteness of the consideration therein expressed. This we consider as the question of prime importance on this appeal. It is recognized by all the authorities upon this subject that no principle of law has given rise to more contrariety of judicial opinion than that of the vendor's lien and its enforcement. From the nature of the equity there can be few fixed rules regarding it. Indeed, one writer has said:

"Its existence depends upon and is controlled by no well-settled rules, but, on the contrary, the existence of the lien is generally made to depend upon the peculiar state of facts and circumstances surrounding the particular case; that is, whether or not a case of natural equity is established, and, if so, whether it is not made to yield to higher or superior equities in some other person, whether the party is not to be regarded as having waived it, or as having intended to waive or postpone it to another equity, or whether, by the acts, or omissions to act, or by the neglect of the party claiming such lien to enforce it within a reasonable time, the right is not lost as being the superior claim. These considerations control and vary the result as equity demands." 2 Jones on Liens, § 1063.

See, also, Acree v. Stone, 142 Ala. 156, 37 South. 934.

It is well recognized in the decisions of this court that this equitable relief has been extended as far as that of any other court, and to a much greater extent than several of them have gone. Parrish v. Hastings, 102 Ala. 414, 14 South. 783, 48 Am. St. Rep. 50. In Betts v. Sykes, 82 Ala. 378, 2 South. 648, this court said:

"The equitable doctrine of enforcing the vendor's lien for unpaid purchase money of lands sold has been steadfastly maintained in this court in its full strength, and it is not our intention to weaken or impair that doctrine. * * * The principles declared in some of these cases probably go beyond the doctrine declared in other jurisdictions. * * * We will adhere to our [own] rulings."

[1] As to whether the equitable lien exists as a security for unliquidated and uncertain damages, the authorities are likewise not uniform. Bridgeport Land, etc., Co. v. Am. Fireproof Steel Co., 94 Ala. 592, 10 South. 704; 29 Am. & Eng. Ency. of Law (2d Ed.) p. 744; Marchand v. Chicago, etc., R. R. Co., 147 Mo. App. 619, 127 S. W. 387; Hooper v. Savannah & M. R. R. Co., 69 Ala. 529; Parrish v. Hastings, supra. The case of Burroughs v. Burroughs, 164 Ala. 329, 50 South. 1025, 28 L. R. A. (N. S.) 607, 137 Am. St. Rep. 59, 20 Ann. Cas. 926, dealt with this question. It was there held that no vendor's lien exists where the sole consideration for the conveyance was the agreement of the grantee to care for and support the grantor during life, because of uncertainty and indefiniteness of consideration. That authority is rested upon the reasoning of the difficulties in the way of ascertaining with reasonable certainty the correct consideration as reduced to a moneyed demand. As appears in 29 Am. & Eng. Ency. of Law, supra, speaking of agreements of this character, "the impracticability of their enforcement operates the withholding of equitable relief." On the other hand, it has been uniformly held by this court that, when the consideration for the sale of land is the delivery of chattels and choses in action, which are capable of reduction to a money value, the vendor's lien exists for the collection of such value, upon a failure to deliver them in accordance with the terms of the contract, although this court has frequently recognized that such holding was contrary to the generally prevailing rule. Cordova Coal Co. v. Long, 91 Ala. 538, 8 South. 765; Campbell v. Goldthwaite, 189 Ala. 1, 66 South. 483.

[2] It is further a well-recognized rule in this state that in every sale of lands, when the purchase money is not paid, the law presumes the reservation of the vendor's lien, unless the terms of the contract of sale, or the attendant circumstances of the transaction, satisfactorily show it was purposely excluded. Hubbard v. Buck, 98 Ala. 440, 13 South. 364; Carver v. Eads, 65 Ala. 190; Hooper v. Savannah, etc., R. R. Co., supra. This presumption is rested upon the principle of natural justice and equity, that one man should not get and hold the lands of another without compensation.

[3] The contract of sale (subsequently consummated by a conveyance of the property under two separate deeds, as shown by the averments of the bill) discloses a sale of a large body of land, at an agreed price of $4.25 per acre, upon consideration of $7,500 in stock of the vendee corporation, and the assumption of the owner's indebtedness on his contract for the purchase of 4,608 acres of land, with the further agreement that should there be any difference between the price of the lands bought and the value of the stock and other obligations, such difference was to be covered by a note of the owner, held by the company pending final adjustment, and that the owner guaranteed the valuation of the lands to reach $5 per acre, in which event such note was not to be paid but was to be canceled and surrendered. The contract then shows a special agreement as to 540 acres of land, which is referred to as the "personal lands" of said John J. Benson, and as having been splendidly improved and in such a state of cultivation as to make them worth more than $5 per acre; that said Benson, desiring to aid in the formation of the vendee

corporation, which could not be completed without his aid, was induced by his son, William E. Benson, to include said lands within the sale, with the express agreement, however, that in the event of the value of the land exceeding $5 per acre any excess, with respect to the 540 acres of "personal lands," should be paid in additional stock of the company, in cash, or such other proceeds as said William E. Benson may elect to accept at the time of the adjustment to be made within the expiration of 20 years from date. William E. Benson, the son, died, and no adjustment had been made, nor had the period of 20 years expired. The agreement above referred to clearly constituted a very important part of the consideration of the sale of this land, and that the owner intended a protection of himself as to any enhancement in value of the lands referred to as the "personal lands," which were well improved. We can see no reason why such enhanced valuation should not be considered a part of the purchase price, as clearly the agreement that the owner should receive the difference between $5 per acre and such enhanced value was one of the causes inducing the trade.

It is argued, however, that as to whether or not there should be any enhancement in value is a matter so uncertain as to create a contingent demand, which cannot become the subject of a vendor's lien. This question was given consideration by the Supreme Court of Wisconsin in the case of De Forest v. Holum, 38 Wis. 516. There was an agreement in that case that, if a railroad should be built through the lands sold within a certain time, a further consideration of $500 would be paid for the land. The event happened, and it was held that a vendor's lien could be enforced for the collection of such sum; the court saying:

"Failing the contingency, the whole purchase money was satisfied by the notes and mortgage; happening the contingency, another sum would then become purchase money, which before had formed no part of the purchase money."

And further:

"That upon building of the railroad, the $500 became additional purchase money of the premises, vesting a right of recovery in the appellant, and attaching a vendor's lien for it on the land."

So, in the instant case, when the land became of value exceeding $5 per acre, and the adjustment was had, the difference in the valuation constitutes a part of the purchase money. We approve the reasoning of the Wisconsin court in the above-cited case, and think it directly applicable here; the only difference upon this particular question being that in the De Forest Case, supra, the balance due was a fixed sum, while in the instant case the valuation must be determined by the court from the evidence in the cause. But, as previously pointed out, this court is committed to the doctrine that, where the consideration for land is a delivery of chattels or choses in action, the vendor may enforce his lien for the purchase price by making proof of the value of the chattels or choses in action agreed to be delivered. We can see no distinction in principle in those cases and that here under consideration, where, in order to make the sum certain, instead of proving the value of the chattels or choses in action, proof of the value of the real estate is required. This is a matter which can be easily ascertained to a reasonable certainty, just as could the valuation of the choses in action or chattels just referred to. Such being the case, while the contract here under consideration may be somewhat unique and unusual, yet we see no sound principle, under the authorities in this state, upon which it should be held the vendor's lien did not exist.

[4] It is next insisted that the contract is uncertain as to the description of the land, upon which the lien is here sought to be enforced—citing Ala. Min. Land Co. v. Jackson, 121 Ala. 173, 25 South. 709, 77 Am. St. Rep. 46; 39 Cyc. 1187; Hurt v. Freeman, 63 Ala. 335. In Minge v. Green, 176 Ala. 343, 58 South. 381, it was said:

"'Id certum est quod reddi potest' is a maxim which has been frequently and liberally applied by this court for the upholding of imperfect descriptions of this character."

See, also, Nolen v. Henry, 190 Ala. 540, 67 South. 500, Ann. Cas. 1917B, 792, and authorities there cited.

We entertain the view, however, that the instant case is not dependent upon the principle recognized in these cases. The contract shows that John J. Benson was due a large sum of money on a contract of purchase for 4,608 acres of land, but that 540 acres, which he included in the sale, is referred to as "personal lands," well improved, and in a state of cultivation. It further appears from the bill that these 540 acres of "personal lands," mentioned in the contract as belonging to said John J. Benson individually, were conveyed to the Dixie Industrial Company by the deed of February 12, 1904, along with other lands, and that the said Dixie Industrial Company went into possession of the same, and it or its vendees have so remained since that time. Then follows a description of the 540 acres of land, referred to as the "personal lands," by government numbers. Under these circumstances, therefore, we are of the opinion that no question of uncertainty of description as to said 540 acres of land, as set forth in the written contract, can avail to deprive the complainants of the enforcement of the vendor's lien upon the specifically described 540 acres of which the vendee, or its purchasers, is in possession. So far as this question of uncertainty of description is concerned, the contract is fully executed.

[5] It is further insisted that there is a

misjoinder of parties complainant. The bill shows that the original contract signed by John J. Benson provided for the payment of the difference in valuation to his son, William E. Benson. Therefore, under such circumstances, it would seem to disclose a legal right in William E. Benson to collect the sum found to be due. However, it is further averred that such a stipulation in the contract was inserted through inadvertence or mistake, and without the knowledge of the said John J. Benson; it also appearing that the son, William E. Benson, was not a party to the contract. John J. Benson individually, therefore, as asserting the equitable right to the sum, is joined as a party complainant with the administrator of the estate of William E. Benson, deceased, who, upon the face of the contract, would appear to have the legal right. Thus both rights are before the court, and a decree of the court against the respondents in this cause would be full protection to them as against any claim arising under said contract.

The bill further shows that, if there should appear to be any conflict in the interest of John J. Benson, individually, and John J. Benson, as administrator of the estate of William E. Benson, deceased, that is a matter which will be settled by future litigation between these parties. We cannot see that it is such a matter of which these respondents can complain. We are of the opinion that in the enforcement of this claim, under the averments of the bill, there is not a misjoinder of parties complainant.

[6] Nor do we think the bill multifarious. It seeks the enforcement of a vendor's lien, charging subsequent purchasers with notice, and praying that, in the event the court should hold that said lands themselves should not be charged in equity for said debt, in justice to said subsequent purchasers, that the unpaid purchase money due to the original vendee be condemned and applied to the payment of the sum found due the complainants. All matters of relief are but incidental to the main equity of the bill—the enforcement or satisfaction of the vendor's lien.

[7, 8] We do not find anything in the contract which would condemn it as a speculative venture, which seems to be insisted upon by counsel—citing Nelson v. Manning, 53 Ala. 549. Nor do we think that the elec-tion provided for, to be made by William E. Benson, as to whether or not the amount found to be due should be paid in money, additional stock, or other proceeds, was of such a personal character as to destroy any rights thereunder because of the death of said William E. Benson without his having made such an election. The case of Trammell v. Craddock, 100 Ala. 266, 13 South. 911, has been considered in this connection, but we do not think it applicable here.

We have reached the conclusion that the bill contains equity, and was not subject to the demurrers interposed thereto. The decree appealed from will accordingly be affirmed.

Affirmed.

ANDERSON, C. J., and McCLELLAN and SAYRE, JJ., concur.